815 F.2d 278
 Jean ARMSTEAD, Appellant,
v.
UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT;
Samuel R. Pierce, Jr., Secretary of the United States
Department of Housing and Urban Development; Joseph
Russell, Chief Loan Management Branch, Philadelphia Area
Office; and Fidelity Bond and Mortgage Company, Appellees.
 No. 86-1452.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 21, 1987.
Decided March 31, 1987.
 
 Michael Donahue (argued), Delaware County Legal Assistance Association, Inc., Chester, Pa., for appellant.
 Dolores Keegan (argued), Sp. Asst. U.S. Atty., Philadelphia, Pa., for appellees.
 Before GIBBONS, Chief Judge, WEIS and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 After declining her request to accept an assignment of her mortgage, the Department of Housing and Urban Development told plaintiff that she could have a face-to-face conference with an agency official if she telephoned for an appointment. In an affidavit plaintiff stated that she did call the agency, but was dissuaded from further action by the unidentified person who answered the phone. Relying on the fact that its records contain no notation of the call, the agency refused a renewed request for a conference. We conclude that by failing to credit the plaintiff's uncontradicted affidavit in denying this de minimis accommodation, the agency action was arbitrary and capricious. Accordingly, we will vacate the district court judgment in favor of HUD and will direct that plaintiff be granted a conference.
 
 
 2
 On the record before us, after the death of Charles Armstead in 1980, his widow, the plaintiff Jean Armstead, became the sole owner of a home at 1531 Lincoln Avenue, Sharon Hill, Pennsylvania. The property is encumbered with a mortgage held by Fidelity Bond & Mortgage Company and insured by HUD under Sec. 220 of the National Housing Act. 12 U.S.C. Sec. 1715k.
 
 
 3
 The mortgage, originally given in 1965, is for a term of thirty years. Payments were current until September 1984, when plaintiff fell into default with a balance due of $6,300. In December of that year, Fidelity advised plaintiff that the mortgage was subject to foreclosure but that it might be eligible for assignment to HUD under the Mortgage Assignment Program. 12 U.S.C. Sec. 1715u and 24 C.F.R. Secs. 203.650.
 
 
 4
 On request, plaintiff submitted detailed information, and after review, Fidelity decided that she did not meet the prerequisites for assignment. According to Fidelity, plaintiff failed to show that the default was caused by circumstances beyond her control or that there was a reasonable prospect for resumption of regular payments. Fidelity wrote plaintiff that it would not recommend HUD accept an assignment, but that she was free to work directly with the agency.
 
 
 5
 Plaintiff then contacted HUD and, at its request, completed several pages of forms. She represented that she had last worked in February 1979, when she had left employment to care for her seriously-ill husband. After his death, she had suffered a mild heart attack and subsequently was denied employment because of her health. Her daughter and grandson who live with her, had received Social Security payments until 1982, when those benefits were terminated. The three presently receive $358 monthly from the Pennsylvania Department of Public Welfare.
 
 
 6
 After considering this and other information, the HUD office in Philadelphia sent a letter to plaintiff on March 29, 1985, explaining that it had decided not to accept an assignment of the mortgage "at this time." However, the letter requested additional data to aid in evaluating whether the default had been caused by circumstances beyond her control and whether she would be "able to catch up on [her] mortgage payments in the future."
 
 
 7
 The letter continued, "[b]efore we can make a final decision we need the following information," and requested various items bearing on the plaintiff's financial situation as well as her physical condition. Finally, the letter said, "[y]ou have a right to discuss our decision at a face-to-face meeting with us. YOU MUST ASK FOR THIS MEETING BEFORE April 13, 1985 .... When you call or write to request a meeting, we will set a time and place .... IF YOU WANT TO HAVE A MEETING, call Mr. Albert Aladjem at [phone number] or write to us .... If we do not hear from you by April 13, 1985, we will think that you accept our preliminary decision as correct."
 
 
 8
 Plaintiff contends that she did call the agency, but HUD denies it. On April 25, HUD wrote Fidelity stating that plaintiff had not appealed the preliminary negative decision to refuse assignment.
 
 
 9
 When Fidelity began foreclosure proceedings in August, plaintiff consulted the Delaware County Legal Assistance Association. In a letter dated August 13, 1985, the attorneys described the plaintiff's April call to HUD. A woman who answered the telephone had advised plaintiff that the agency would not be able to take the assignment because of her income level, and therefore a conference was never held. The Legal Assistance Associates requested HUD to reconsider the case. HUD responded two weeks later, refusing to reopen.
 
 
 10
 Plaintiff then filed a complaint in the district court, asking that HUD be required to conduct a conference and accept an assignment. The district court granted summary judgment for HUD, concluding that it did not err in declining an assignment of the mortgage and that evidence supported its determination that plaintiff had not requested a conference before April 13, 1985.
 
 
 11
 On appeal, plaintiff does not ask us to reassess the merits of HUD's decision to decline an assignment, but limits her arguments to the agency's refusal to reopen the case and grant the face-to-face conference.
 
 
 12
 The plaintiff's right to a conference with a HUD representative is granted by regulation. 24 C.F.R. Sec. 203.654(c). When the agency's preliminary review does not favor assignment, the mortgagor may present additional data by mail or phone, "or alternatively, ... shall be entitled to present such information or argument in person at a conference." The regulations further provide that the conference "shall not be an adversary proceeding or subject to formal rules of evidence." 24 C.F.R. Sec. 203.656. The mortgagor may be represented by an attorney and present oral or documentary information.
 
 
 13
 Also pertinent to the issue before us are a number of provisions in HUD handbook 4330.2. They state that if the mortgagor later contacts the agency and "indicates 'good cause' for not requesting a conference within the time limit, the Field Office shall proceed with its consideration." That process includes contacting the mortgagee to delay foreclosure and "where the mortgagee agrees to such delay, [the agency] shall accord the mortgagor a full HUD review." (4-6(c), 4-3(b)).[1]
 
 I.
 
 14
 Administrative agencies perform duties that may be characterized as rulemaking or adjudication, but they also engage in activity that has been termed "informal action." As Professor Davis writes, "[a]gencies do not necessarily either adjudicate or make rules when they initiate, investigate, threaten, publicize, conceal, plan, recommend, and supervise.... [T]he general understanding continues that some informal action is neither adjudication or rulemaking." K. Davis, Administrative Law Treatise Sec. 1:4 (1978).
 
 
 15
 Characterization of agency action is important in determining the appropriate standard of judicial review. In some instances where the agency "action is adjudicatory in nature and the agency factfinding procedures are inadequate," the district court may conduct a de novo review. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Plaintiff argues that the decision not to reopen her case is an adjudication and therefore the district court should have used the de novo test.
 
 
 16
 The Administrative Procedure Act defines "adjudication" as an "agency process for the formulation of an order," 5 U.S.C. Sec. 551(7), and defines "order" as a "final disposition ... of any agency in a matter other than rule making." 5 U.S.C. Sec. 551(6).
 
 
 17
 HUD, on the other hand, insists that because the statute does not require a formal adjudicatory hearing in the mortgage assignment program, its decision in this case should be treated as informal agency action reviewable under the arbitrary and capricious standard of 5 U.S.C. Sec. 706(2)(A). The court of appeals in Anderson v. United States Dep't of Housing and Urban Development, 701 F.2d 112 (10th Cir.1983), concluded that HUD's determination not to accept an assignment was reviewable as informal agency action. In that case, however, the HUD action was taken only after the court had ordered a face-to-face conference between the mortgagor and the agency.
 
 
 18
 Plaintiff argues that the agency decision finding lack of good cause to reopen a case bears some indicia of an adjudication. Although that position has some merit, we need not decide the question. We will assume without deciding that the arbitrary and capricious standard applies here.
 
 
 19
 We will also accept HUD's position that the record on review consists of the administrative record, supplemented by the affidavits filed in the district court. "The administrative record together with the supporting affidavits provides a sufficient basis to show how the decision was reached and will not frustrate judicial review.... [T]hese affidavits were provided to explain the information which was available to these decisionmakers at the time the decision was being made." Brief for HUD at 10.
 
 
 20
 Plaintiff filed an affidavit in the district court, asserting that she had called the telephone number listed in HUD's letter before April 13, 1985, as directed. The telephone was answered by a woman "who stated that it was the Department of Housing & Urban Development." The woman asked for the amount of the plaintiff's income and, when told what it was, said that her "income was too low for HUD to be of assistance." The affidavit continues, plaintiff "did not know that there was anything further that I could do to provide for the processing of my assignment." The plaintiff's affidavit clearly set out the facts establishing her compliance with HUD's letter.
 
 
 21
 HUD filed two responsive affidavits. The first by Albert Aladjem, designated in HUD's March letter as the person plaintiff should call, stated that she had not contacted him personally, either by telephone or in writing, about the face-to-face conference. Nor had he received any messages from anyone in the HUD office that plaintiff had telephoned.
 
 
 22
 The second affidavit was given by Joanne Peake, Aladjem's supervisor. She did not speak with plaintiff at any time, nor had she been advised of any calls after January 25, 1985, when the file showed that plaintiff had telephoned Dianne Whittington, the HUD assignment clerk.[2] The Peake affidavit also described the "usual practice" of the office to refer calls from mortgagors to "the servicer assigned the file, or if the servicer is unavailable and an immediate response is required, the call is transferred to a supervisor." Further, it is "the usual practice ... to make a record in the mortgagor's file of any telephone conversations," yet the only notation in the plaintiff's file was that of January 25, 1985.
 
 
 23
 We have no reason to doubt the honesty of any of the three affidavits, and the alleged facts are not contradictory. We will accept each of the affidavits as truthful. That of Mr. Aladjem adds nothing to the case because he asserts only that he never talked to plaintiff, and on that point, the same is true of the Peake affidavit. However, plaintiff does not contend that she ever spoke to either Peake or Aladjem.
 
 
 24
 Plaintiff does say under oath that she talked to a woman who answered the phone at the HUD office. The agency fails to controvert this statement, and relies instead on its "usual practice" to log telephone calls from mortgagors. Because the plaintiff's file contains no notation, HUD says plaintiff did not call.
 
 
 25
 Based on the record before us, HUD failed to canvass the female employees in the office to determine if any of them had spoken to plaintiff. Nor did defendant inform us how many female employees work in the Philadelphia office or the number who have access to the telephones.[3]
 
 
 26
 The weakness of HUD's defense is glaring. We need not cite authority to support our conviction that the "usual practice" is not always followed in offices, private or governmental, large or small. The people at work there are not automatons; they are human beings, not immune from lapses in procedure because of distractions, overwork, forgetfulness, carelessness, or other foibles to which we are all vulnerable.
 
 
 27
 That something should have been done does not prove that it was done, but that is precisely the fallacy on which HUD relies to deny plaintiff a hearing. Resting a decision on such an unsupportable ground is a classic example of arbitrary and capricious conduct.
 
 
 28
 In addition, the HUD manual provides that reopening should be granted when a mortgagor presents "good cause". The provisions of the HUD manual were not published in the Federal Register, as the Administrative Procedure Act mandates, and therefore do not constitute valid regulations. Furthermore, the sections relevant here are interpretive, rather than substantive in nature, and therefore, are not binding on either the agency or this court. Daughters of Miriam Center for the Aged v. Mathews, 590 F.2d 1250, 1258 (3d Cir.1978); Concerned Residents of Buck Hill Falls v. Grant, 537 F.2d 29, 38 (3d Cir.1976); McCullough v. Redevelopment Auth. of the City of Wilkes-Barre, 522 F.2d 858, 867 n. 27 (3d Cir.1975).
 
 
 29
 Although not binding, the manual sections are nevertheless instructive and may serve "as indicia of whether the evaluation procedures adopted in a particular case are 'arbitrary and capricious.' " Concerned Residents of Buck Hill Falls, 537 F.2d at 38.
 
 
 30
 The plaintiff's unrefuted representation that she timely called the HUD office and was dissuaded from speaking to Aladjem by an unidentified HUD employee is "good cause." The record makes it obvious that plaintiff is not a person acquainted with the arcane skills of statutory and regulatory construction needed to determine her eligibility for relief under the Mortgage Assignment Program. It requires no straining of credulity, and but a modicum of understanding, to accept the likelihood that she believed the statement of the unknown HUD employee that nothing further could be done. The misleading opinion of the HUD employee certainly constitutes "good cause" and should have guided the decision on reopening. HUD's failure to consider this important aspect of the plaintiff's case reinforces our conclusion that the decision was arbitrary and capricious. Frisby v. United States Dep't of Housing and Urban Development, 755 F.2d 1052, 1055 (3d Cir.1985).
 
 
 31
 We are compelled to comment on the inexcusable waste of resources by the governmental agency in this case. Had plaintiff been granted the hearing she requested, we would expect that it would have taken about a half-hour of a HUD representative's time. Rather than extend this slight consideration, the agency refused to honor the plaintiff's entirely reasonable request and thus precipitated this lawsuit.
 
 
 32
 Even after the litigation had begun, HUD persisted on its obstinate course. As late as the date of oral argument in this court, the agency rebuffed our suggestion that the case be mooted by an offer to conduct a hearing. The expenditure of valuable time by the U.S. Attorney's office, the district court, and this court as well is out of all proportion to the insignificant effort by HUD that would have resolved the issue.
 
 
 33
 We are well aware of the necessity for observing orderly procedures so that tax funds are used in the most efficient fashion. But in its wooden refusal to credit a citizen's uncontradicted assertions of compliance with its requirements, the agency has undermined its own efficiency and unnecessarily disrupted the work of other governmental bodies as well.
 
 
 34
 Equally distressing is the lack of sympathetic consideration for a citizen whose plight, together with that of many others, led Congress to enact the remedial statute which HUD must implement. This unresponsive stance is especially egregious here where plaintiff holds substantial equity, owing now only about $7,000 on the mortgage while her home is valued at approximately $45,000.
 
 
 35
 In this year when we celebrate the two hundredth anniversary of the Constitution, we do well to remember that it begins with "We the People." It is they who have granted authority to government and are to be served by it. To assure continued recognition of that relationship, the Constitution contains a combination of checks and balances. When one branch of the government fails in its duty, another may have the duty to correct the situation. If a government agency fails in its mission to extend to all citizens, poor as well as wealthy, the consideration to which they are entitled by law, the courts have the responsibility to step in and correct the dereliction. We regret that it has been necessary to do so here.
 
 
 36
 We will vacate the judgment of the district court and direct that HUD grant a face-to-face conference with plaintiff and give fair, objective, and impartial consideration to her case.
 
 JAMES HUNTER, III Circuit Judge, dissenting:
 
 37
 I respectfully dissent.
 
 
 38
 In 1980, following the death of her husband, Jean Armstead acquired sole title to their home at 1531 Lincoln Avenue, Sharon Hill, Pennsylvania. The property is incumbered by a mortgage held by Fidelity Bond and Mortgage Co. ("Fidelity") and insured by HUD. In December of 1984, Fidelity sent notice to Armstead that the mortgage was in serious default and subject to foreclosure. The notice also stated that Armstead may be eligible for an assignment of her mortgage to HUD under the Mortgage Assignment Program. See 12 U.S.C. Sec. 1715u (1982) and 24 C.F.R. Sec. 203.650 et seq. (1986). Accordingly, Fidelity requested Armstead to complete and submit some forms so that Fidelity could determine Armstead's eligibility for the program. Armstead complied, but Fidelity determined that she failed to meet two conditions of eligibility--to wit, the default was not caused by circumstances beyond her control, and there was no reasonable prospect for resumption of regular payments. See 24 C.F.R. Secs. 203.650(a)(5) and (6) (1986). Therefore, by letter dated January 17, 1986, Fidelity informed Armstead that it would not ask HUD to take an assignment but that she had the right to contact HUD directly to request acceptance of an assignment.
 
 
 39
 Armstead contacted HUD, and HUD asked her to supply some information. She did so. On the basis of this information HUD made the preliminary determination that she was not eligible for an assignment for the same reason previously enumerated by Fidelity. By certified letter dated March 29, 1985, HUD informed Armstead of its preliminary determination. The letter explained the bases of HUD's findings and stated that she could challenge the determination at a face-to-face conference. The letter instructed Armstead to write to HUD or to call Mr. Albert Aladjem, a HUD Loan Specialist, in order to arrange a conference. The letter went on to say that if she failed to write or call by April 13, 1985, the preliminary determination would become final. Enclosed in the letter was a list of housing counselors and legal aid agencies from which Armstead could obtain assistance.
 
 
 40
 Armstead neither wrote to HUD nor spoke to Mr. Aladjem; therefore, on Mr. Aladjem's recommendation, the preliminary determination became final on April 24, 1985. The following day HUD sent a letter to Fidelity informing Fidelity that it was free to proceed with foreclosure. A copy of this letter was apparently sent to Armstead.
 
 
 41
 Approximately four months later, Armstead received a mortgage foreclosure complaint. She then contacted an attorney. The attorney sent to HUD a letter alleging that Armstead had called HUD prior to April 13, and that "[s]he spoke with a woman who informed her that HUD would not be able to take the assignment because of her income level." Administrative Record at 49. The attorney, therefore, requested HUD to reopen the case and grant Armstead a belated assignment conference. HUD refused.
 
 
 42
 Armstead then filed suit in federal district court averring, inter alia, that HUD wrongfully refused to reopen the case and grant a conference. After each side submitted affidavits, the district court granted HUD's motion for summary judgment. This appeal followed.
 
 
 43
 Appellant Armstead first argues that the district court applied an incorrect standard of review. In its Memorandum In Support Of Motion For Summary Judgment, HUD asserted that its processing of an application for a mortgage assignment is an informal agency action and subject to judicial review under the arbitrary and capricious standard. See, Administrative Procedures Act, 5 U.S.C. Sec. 706(2)(A) (1982); and see, Anderson v. United States Dept. of Hous. and Urban Dev., 701 F.2d 112 (10th Cir.1983) (handling of mortgage assignment application is informal action subject only to arbitrary and capricious standard of review). Appellant apparently agreed that the arbitrary and capricious standard should be applied, see, Plaintiff's Memorandum Against Summary Judgment at 32, and the district court reviewed the case under that standard. Now, appellant argues for the first time that HUD's denial of the request for a belated conference should have been reviewed de novo in the district court. "We generally refuse to consider issues that are raised for the first time on appeal absent exceptional circumstances, ... and have held on numerous occasions that a trial court should never be reversed on grounds that were never urged or argued below." Caisson Corp. v. Ingersoll-Rand Co., 622 F.2d 672 (3d Cir.1980); see Newark Morning Ledger Co. v. United States, 539 F.2d 929, 932-33 (3d Cir.1976); Walker v. Sinclair Refining Co., 320 F.2d 302, 305 (3d Cir.1963) (en banc). I detect no exceptional circumstances in this case, and I therefore agree with the majority that we should review this case under the arbitrary and capricious standard.
 
 
 44
 Our inquiry, therefore, is whether HUD's denial of appellant's request to reopen and to grant a conference was arbitrary, capricious, or an abuse of discretion. Appellant urges that she was prevented from making a timely request for a conference because the alleged telephone conversation that she had with the woman at HUD led her to believe that a conference would be fruitless. Thus, appellant contends, she had "good cause" not to properly request a conference, and under HUD regulations,
 
 
 45
 Where the mortgagor's failure to respond was due to ... good cause shown, the Field Office shall request the mortgagee to delay foreclosure; if the mortgagee agrees to the delay, the Field Office shall afford the mortgagor a full review. "Good cause" could include, but is not limited to, failure to receive the mortgagees' notice because of being hospitalized or out-of-town or the notice being sent to the wrong address.
 
 
 46
 HUD Handbook 4330.2, chpt. 3-4(b). In this case, HUD did not find good cause to request the mortgagee to delay foreclosure and to grant a belated full review.
 
 
 47
 I cannot say that HUD's failure to find "good cause" was arbitrary or capricious. HUD's records do not indicate that the alleged telephone conversation ever transpired. In light of the fact that it is HUD's normal practice to make records of all telephone contacts with mortgagors and in light of the fact that previous telephone contacts with Armstead are noted in the HUD record, it was not unreasonable for HUD to assume that the alleged conversation never occurred.[1] Even assuming, however, that the conversation did take place, I believe that HUD would still have been justified in refusing to reopen the case. While the HUD regulations do not provide an exhaustive list of what constitutes "good cause," it is fair to infer that "good cause" only exists when the mortgagor's failure to request a conference is caused by no fault on the part of the mortgagor. Here, it cannot be said that appellant was without fault. First, appellant does not even allege that she ever wrote a timely letter to HUD or that she ever asked to speak to Mr. Aladjem as the letter of March 29 instructed her to do. Second, there is no indication in the administrative record or the district court record that any employee of HUD ever represented that appellant was not entitled to a conference upon timely request; at most, the record indicates that the unknown woman with whom appellant conversed stated that appellant's income was too low for HUD to accept an assignment; thus, she merely iterated a reason for HUD's preliminary determination not to accept an assignment. Finally, appellant did not seek counsel or request a belated conference until August of 1985 even though HUD's letter of April 25, 1985 indicated that foreclosure was impending; thus, appellant acted dilatorily. Under these circumstances, I agree with the district court that HUD's actions were neither arbitrary nor capricious.
 
 
 48
 I would affirm the judgment of the district court.
 
 
 
 [1]
 At oral argument, we were advised by plaintiff's counsel that at his request, the mortgagee had agreed to suspend foreclosure until resolution of the dispute with HUD
 
 
 [2]
 The documented phone call to Ms. Whittington occurred more than two months before plaintiff received the letter of March 29, 1985, and consequently could not have been in response to the notice about a conference
 
 
 [3]
 The dissent notes that under Fed.R.Evid. 803(7), absence of an entry in relevant business records may be used to prove the non-existence or non-occurrence of a matter. The Rule allows such evidence as an exception to the hearsay rule. The admission of such evidence, however, depends upon presentation of a proper foundation, and exclusion may result where circumstances "indicate lack of trustworthiness." In Stevenson v. Linens of the Week, 688 F.2d 93 (D.C.Cir.1982), negative record evidence was found insufficient when it did not meet the "specificity of the claimant's evidence and allegations." See also United States v. Robinson, 544 F.2d 110 (2d Cir.1976) (not admissible when records "confused" and "indefinite.") See also 4 Louisell, Federal Evidence 714 (1980)
 Plaintiff has pointed to one record of HUD which does not contain complete information (see Appendix at 82). It is significant, also, that the HUD affidavit refers to its "usual practice" of logging phone calls, rather than a "regular practice." Nor does it declare who has the responsibility of entry or when the entries are made. Moreover, as we have noted, plaintiff's testimony is direct and specific. In short, although negative evidence may be admissible in appropriate circumstances, that does not justify HUD's position on this record.
 
 
 [1]
 I am frankly baffled by the majority's conclusion that HUD is not entitled to rely on its own records. The majority reaches this conclusion by taking judicial notice of the fact "that the 'usual practice' is not always followed in offices...." While I am willing to admit that we live in a world where mistakes occur, I do not believe that this fact alone makes it arbitrary or capricious to believe that that which normally happens in fact did happen. My position is amply supported in the law of evidence. Federal Rule of Evidence 803(6) provides for the admissibility of any "memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the item by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." The rationale behind this exception to the rule against hearsay is that the inherent reliability of business records is "supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation." Fed.R.Evid. 803(6) advisory committee's note
 Just as a notation in a business record may provide evidence of the occurrence of an event, under Fed.R.Evid. 803(7), the absence of an entry in relevant business records may be used to prove the nonoccurrence or nonexistence of a matter. The logic of this rule was eloquently and forcefully explained by Professor Wigmore:
 When a book purports to contain all items transacted within the scope of the book's subject, the absence of an entry of transaction of a specific purport is in plain implication a statement by the maker of the book that no such transaction was had. The psychology of it is the same as that of testimony on the stand by a person who denies that a sound took place in his presence because he heard no such sound. The practical reliability of it is shown by every day's practice in every business house. All industry and commerce is daily conducted on the negative as well as on the affirmative showings of the regular books of entry. The repetition in modern times of rulings so divorced from common experience is astonishing. They must make the businessman think that law is just a queer game.
 
 
 [5]
 J. Wigmore, Evidence Sec. 1531 (Chadbourn ed. 1974)
 There can be little doubt that the HUD record is a "business record" within the meaning of Fed.R.Evid. 803(6) and (7). I cannot see why HUD should be precluded from relying upon the same type of evidence that is used virtually daily in the federal courts to support civil judgments and criminal convictions.